JS 44 (Rev. 12/07, NJ 5/08)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SEA BOX INC.

(b) County of Residence of First Listed Plaintiff **Burlington**

(c) **Attorney's (Firm Name, Address, and Telephone Number, and Email Address)**

Sean T. O'Meara, Esquire,
Archer & Greiner, P.C.
One Centennial Square
Haddonfield, NJ 08033
(856) 795-2121
someara@archerlaw.com

## DEFENDANTS

The Valspar Corporation

County of Residence of First Listed Defendant

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☑ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☑ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury-Med-Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities – Employment
☐ 446 Amer. w/Disabilities – Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motion to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**

PERSONAL INJURY
☐ 362 Personal Injury-Med-Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor, Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☑ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff of Defendant)
☐ 871 IRS-Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**): 28 U.S.C. § 1332 - Diversity
28 U.S.C.§1332

Brief description of cause:
FRAUD, BREACH OF WARRANTY AND NEGLIGENCE CLAIMS REGARDING THE SALE OF DEFECTIVE COATING

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☑ Yes ☐ No

## VIII. RELATED CASE(S)

(see instructions): JUDGE DOCKET NUMBER

Explanation:

**DATE**
**February , 2013**

**SIGNATURE OF ATTORNEY OF RECORD**
***/s/ Sean t. O'Meara***

ARCHER & GREINER
A Professional Corporation
One Centennial Square
Haddonfield, New Jersey 08033
(856) 795-2121
Attorneys for Plaintiff

By: SEAN T. O'MEARA (SO0861)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| SEA BOX INC., Plaintiff, | Civil Action No. |
| vs. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| THE VALSPAR CORPORATION, Defendant. | |

Plaintiff, Sea Box Inc. ("Sea Box"), by way of complaint against defendant, The Valspar Corporation ("Valspar"), says:

**JURISDICTION**

1. This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 inasmuch as Sea Box is a citizen of New Jersey and Valspar is a citizen of Minnesota and Delaware, and the amount in controversy exceeds $75,000.

**THE PARTIES**

2. Plaintiff, Sea Box, is a New Jersey corporation with its principal place of business located at 1 Sea Box Drive, East Riverton, New Jersey, and is engaged in the business

of manufacturing, modifying, marketing and selling large metal or composite shipping and storage containers used for commercial, civilian government, military and shelter applications.

3. Defendant, Valspar, is a Delaware corporation with its principal place of business in Minneapolis, Minnesota, and is engaged in the business of manufacturing and selling paints and coatings in New Jersey and throughout the world.

**FACTUAL BACKGROUND**

4. Prior to 2008, Valspar supplied oil-based coatings and paint to Sea Box for use on containers Sea Box sold to third parties.

5. In October 2008, knowing that Sea Box intended to bid on a major contract with the U.S. Air Force to supply coated containers, Valspar recommended that Sea Box use a water-based coating known as "Aquaguard", and supplied Sea Box with an October 20, 2008 testing report from KTA-Tator, Inc. demonstrating that Aquaguard was very suitable for the purpose. A copy of a Valspar marketing brochure for Aquaguard is attached hereto as Exhibit "A", and a copy of the October 20, 2008 KTA-Tator Test Report is attached hereto as Exhibit "B".

6. Sea Box negotiated and agreed with Valspar about the price to be paid for the Aquaguard to be used in coating the Air Force containers, and Sea Box then relied upon this price in preparing its bid to the Air Force.

7. Relying on Valspar's assurances about the Aquaguard product, Sea Box entered into a $40 million contract with the U.S. Air Force to supply in excess of 5,000 containers coated with Aquaguard.

8. The Aquaguard was applied to the containers to be supplied to the Air Force in Hong Kong by the installer, which acquired the Aquaguard from Valspar at the price Sea Box and Valspar had negotiated.

9. In accordance with its contract with the Air Force, Sea Box shipped the containers to Holloman Air Force Base in New Mexico and four foreign countries.

10. In approximately May 2009, the Air Force notified Sea Box that the exterior roofs on some of its containers were blistering and peeling at Holloman Air Force Base.

11. As a result of the blistering/peeling problems on the exterior roofs, the Air Force demanded that Sea Box recoat all of the exterior roofs on all of the containers it had shipped to each of the five (5) locations, resulting in repair costs to Sea Box of approximately $3.0 million.

12. After being notified by the Air Force of the roof problems on the containers, Sea Box informed Valspar that it believed that the Aquaguard coating was the cause of the problem, and sought compensation from Valspar.

13. While Valspar did not agree that the Aquaguard was the cause of the problem, claiming that the method used to apply the Aquaguard caused the problems, it subsequently entered into an agreement whereby Valspar agreed to provide a new, reformulated coating required to repair the exterior roofs at no charge (not to exceed 4,500 gallons) and pay Sea Box the sum of $200,000, and Sea Box agreed to release any claims pertaining to the exterior peeling. In addition, as part of the agreement, Sea Box agreed to purchase all of its coatings from Valspar for a period of five (5) years, and Sea Box was to receive quarterly rebates based upon the amount of coatings it purchased. The terms of this agreement were incorporated into a Manufacturing Agreement dated August 4, 2010, a copy of which is attached as Exhibit "C".

14. It now appears that Valspar was aware that the Aquaguard product was defective and that it would continue to fail, and fraudulently induced Sea Box to enter into the Manufacturing Agreement.

15. At the time Sea Box and Valspar entered into the Manufacturing Agreement, the Air Force's complaints of the blistering/peeling problems were limited to the exteriors of the Sea Box containers, in particular, the roofs.

16. Approximately two (2) years later, in April, 2012, the Air Force noticed for the first time that the coating on the interior of the containers was also peeling, and demanded that Sea Box recoat the interiors on all of the containers supplied by Sea Box.

17. Upon being notified by the Air Force of a new claim regarding the container interiors, Sea Box sought compensation from Valspar for the repair costs incurred, but Valspar denied that it was liable to Sea Box.

**FIRST COUNT**
(BREACH OF CONTRACT)

18. Sea Box incorporates the allegations of paragraphs 1-17 as if repeated at length herein.

19. Sea Box and Valspar entered into an agreement for the purchase and sale of Aquaguard, to be used in coating the containers to be sold to the Air Force.

20. The Aquaguard coating was to be suitable and non-defective.

21. Valspar breached its Agreement with Sea Box by supplying its Aquaguard coating, which blistered when the containers were stored outside.

22. As a direct and proximate result of Valspar's breach of contract, Sea Box will incur substantial damages recoating the containers supplied to the Air Force.

WHEREFORE, plaintiff, Sea Box Inc., demands judgment against defendant, The Valspar Corporation, for compensatory damages, counsel fees and costs of suit.

**SECOND COUNT**
(BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

23. Sea Box incorporates the allegations of paragraphs 1-22 as if repeated at length herein.

24. Valspar impliedly warranted to customers like Sea Box that its Aquaguard coating was merchantable, suitable for use and non-defective.

25. Valspar breached its implied warranty of merchantability because the Aquaguard product was in fact defective and not merchantable.

26. Sea Box will incur substantial damages recoating the containers supplied to the Air Force as a direct and proximate result of Valspar's breach of implied warranty of merchantability.

WHEREFORE, plaintiff, Sea Box Inc., demands judgment against defendant, The Valspar Corporation, for compensatory damages, counsel fees and costs of suit.

**THIRD COUNT**
(BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE)

27. Sea Box incorporates the allegations of paragraphs 1-26 as if repeated at length herein.

28. At the time of marketing and sale of the subject Aquaguard coating, Valspar had reason to know the particular purpose for which the product would be used, and knew that its skill and judgment was being relied upon to furnish a suitable product, and accordingly the Aquaguard coating contained an implied warranty of fitness for a particular purpose.

29. Valspar breached the implied warranty of fitness for a particular purpose because the Aquaguard coating was in fact not suitable for use on the containers Sea Box sold to the Air Force.

30. As a direct and proximate result of Valspar's breach of the implied warranty for a particular purpose, Sea Box will incur significant damages recoating the containers supplied to the Air Force.

WHEREFORE, plaintiff, Sea Box Inc., demands judgment against defendant, The Valspar Corporation, for compensatory damages, counsel fees and costs of suit.

**FOURTH COUNT**
(NEGLIGENCE)

31. Sea Box incorporates the allegations of paragraphs 1-30 as if repeated at length herein.

32. Valspar had a duty to exercise reasonable care in selecting a product to recommend to Sea Box for use on the Air Force contract and had a duty to exercise reasonable care to manufacture a suitable, non-defective product.

33. Valspar failed to exercise reasonable care in recommending and then supplying the Aquaguard coating to Sea Box for use on the Air Force contract.

34. As a direct and proximate result of Valspar's failure to exercise reasonable care, Sea Box will incur substantial damages recoating the containers supplied to the Air Force.

WHEREFORE, plaintiff, Sea Box Inc., demands judgment against defendant, The Valspar Corporation, for compensatory damages, counsel fees and costs of suit.

**FIFTH COUNT**
(VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A 56:8-1 et seq.)

35. Sea Box incorporates the allegations of paragraphs 1-34 as if repeated at length herein.

36. Valspar engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentations in connection with its promotion and

sale of its Aquaguard product to Sea Box, resulting in an initial failure of the product very soon after its application.

37. Valspar made affirmative misrepresentations about the Aquaguard product, and omitted disclosing material facts regarding the Aquaguard product as well, in connection with the sale to Sea Box.

38. Valspar's conduct constitutes a violation of New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.

39. Sea Box was injured by Valspar's violation of the Consumer Fraud Act and suffered an ascertainable loss caused by the violations.

WHEREFORE, plaintiff, Sea Box Inc., demands judgment against defendant, The Valspar Corporation, for compensatory damages, treble damages` and reasonable counsel fees as provided by the Consumer Fraud Act, and costs of suit.

**SIXTH COUNT**
(BREACH OF CONTRACTUAL WARRANTY)

40. Sea Box incorporates the allegations of paragraphs 1-39 as if repeated at length herein.

41. Sea Box does not agree that the August 4, 2010 Manufacturing Agreement is valid and enforceable, since it was induced by fraud. In addition, even if the Manufacturing Agreement were valid, it would not pertain to the interiors of the containers, since neither the Air Force nor Sea Box was aware of any problem with the container interiors at that time.

42. In the alternative, however, should it be determined that the Manufacturing Agreement governs this dispute, Attachment "B" to that Agreement contained a limited warranty from Valspar to Sea Box that the Valspar products would meet certain performance standards. See Attachment "B" to Exhibit "C."

43. The Aquaguard coating Valspar supplied to Sea Box did not meet the performance standards set forth in Attachment "B."

44. As a direct and proximate result of Valspar's breach of warranty, Sea Box will incur substantial damages recoating the containers supplied to the Air Force.

WHEERFORE, plaintiff, Sea Box Inc., demands judgment against defendant, The Valspar Corporation, for compensatory damages, counsel fees and costs of suit.

**SEVENTH COUNT**
(FRAUD)

45. Sea Box incorporates the allegations of paragraphs 1-44 as if repeated at length herein.

46. Valspar fraudulently induced Sea Box to enter into the August 4, 2010 Manufacturing Agreement. Specifically, by August 2010, Valspar was aware that the Aquaguard coating was defective, and that these defects caused the exterior peeling and would likely continue to cause problems.

47. Valspar's knowledge of the defectiveness of its Aquaguard product is revealed in part by the fact that the replacement coating it sent to Sea Box at no charge to coat the exterior roofs after the Air Force notified Sea Box about the exterior problems was a new, reformulated product.

48. As a direct and proximate result of Valspar's concealment of the defectiveness of Aquaguard, Sea Box entered into the August 4, 2010 Manufacturing Agreement.

49. Since the Manufacturing Agreement was induced by fraud, it should be declared null and void.

50. In the alternative, should it be determined that the Manufacturing Agreement governs this dispute, Sea Box demands that it be reformed or rescinded to eliminate the fraudulent aspects, or that Sea Box be awarded damages attributable to the fraud.

**WHEREFORE,** plaintiff, Sea Box Inc., demands judgment against defendant, The Valspar Corporation, for compensatory damages, equitable relief, punitive damages, counsel fees and costs of suit.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues.

ARCHER & GREINER
A Professional Corporation
Attorneys for Plaintiff,
Sea Box Inc.

By: */s/Sean T. O'Meara*
SEAN T. O'MEARA

Dated: February 12, 2013
9325552v1

# EXHIBIT "A"

valspar

if it matters, we're on it.®

Introducing Aquaguard™.

# Green paint technology for the container industry.

In an increasingly green global economy, the benefits of being compliant and developing best practices that are more environmentally friendly are critical to success. Besides offering better corrosion protection than solvent-based, zinc-rich systems, new Aquaguard™ leaves a much smaller carbon footprint in terms of either emissions or energy required – which helps you maintain a much bigger bottom line.

In four key areas, when compared to solvent-based systems, Aquaguard™ was shown to offer dramatic advantages.



## 1. Raw Material Production

When comparing the two key formulations, water-borne vs. solvent-based, the two primary differences in the raw materials come in the resin or polymer content, and in the use (or lack thereof) of zinc dust.

***Raw zinc dust is contaminated with lead.*** The smelting process used to eliminate this lead is doubly excessive in its use of energy. To begin with, the blast furnace is run continuously while zinc is pushed through the system. That continuous process is a tremendous consumption of energy. **Secondly, to burn off that lead, the zinc dust used in polymer resin formulations must be heated to as high as 1400° C.**

**Aquaguard™ Energy Advantage**

- ***Less energy to process***
- ***Smaller carbon footprint***

## 2. Transportation of Material

Zinc-rich primers are very dense due to the zinc itself. **Because Aquaguard™ does not use zinc, its density is a mere 11.5 lbs / gallon.** Compare that to the typical density of **16.5 lbs /gallon you get when using zinc rich medium solids** versions used in the Container industry today.

Generally speaking, most regions of the world place restrictions on the weight that a given truck can transport. If you use a maximum weight of 48,000 pounds for a full truck load, the densities above would suggest you could ship the following amounts on that truck.

**Aquaguard™ Primer: 4,174 gallons** **Zinc Rich Primer: 2,909 gallons**

**Aquaguard™ Energy Advantage**

- ***Ship more per load for less.***
  ***Since you can load 43.4% more Aquaguard™ primer on a given truck, you will reduce truck loads and reduce fuel consumption for transportation to the finishing facility. Less fuel equates to a lower carbon footprint.***
- ***Reduce annual fuel onsumption and overall carbon emissions.***
  ***An Aquaguard™ coated container will reduce tare weight by nearly 50 lbs. This in turn will reduce fuel consumption and overall carbon emissions.[1]***

[1] U.S. Environmental Protection Agency, A Glance at Clean Freight Strategies Weight Reduction, February 2004, http://epa.gov/smartway/transport/documents/carrier-strategy-docs/weightreduction.pdf

Introducing Aquaguard™.



## 3. Use of Material (Emissions)

Let's clear the air about emissions. Comparing the emissions that result from the use or application of the solvent-borne and water-borne coating systems, **Aquaguard™ total emissions is 36.04 lbs. per TEU, compared to 126.99 lbs. per TEU with solvent based systems.***

| Solvent-borne System | Total Emissions per TEU |
|---|---|
| Shop Primer | 34.34 lbs. |
| Zinc Rich Primer | 21.76 lbs. |
| Mid Coat | 32.64 lbs. |
| Top Coat | 38.25 lbs. |
| **Total** | **126.99 lbs.** |

| Aquaguard™ System | Total Emissions per TEU |
|---|---|
| Shop Primer | 34.34 lbs. |
| Aquaguard™ Primer | 1.19 lbs. |
| Water-borne Topcoat | 0.51 lbs. |
| **Total** | **36.04 lbs.** |

****The scenario above is for the exterior of a container. A similar example (and result) could be developed for the interior of a container.***

**Aquaguard™ Energy Advantage**

***- 71.6% lower emissions.***

***- Even greater energy advantage when figuring in the cost of cleanup.***

***The composition of the water-borne cleanup material is 50/50 water and solvent, whereas the solventborne system uses pure solvent. In this conservative analysis, the solvent-borne system emits 352% more solvent than the water-borne system.***

## 4. Curing of the Applied Material

In the category of curing, the cure temperatures are lower for the water-borne system, but the air movement required is greater. Based upon our calculations, the two essentially cancel each other out, rendering the cure process as neutral between the two systems in terms of energy consumption.

**Overall Aquaguard™ Energy Advantage**

***- Less energy to process***
***- Lower emissions***
***- Ship more per load for less***
***- Reduce annual fuel use***
***- Substantially smaller carbon footprint on the environment***




**For more information on Aquaguard™ visit www.valsparaquaguard.com or e-mail valsparaquaguard@valspar.com.**

© 2010 Valspar


Improved Corrosion Protection
Just as fire requires three elements to be present to ignite, three things are required for the corrosion process to start.
Elements of Fire
Heat
Fuel
Oxygen
Elements of Corrosion
Water
IONS
Oxygen
Doing any or all of the following stops a fire:
•Spraying water removes the heat, putting out the fire
•Spraying CO2 removes the oxygen, putting out the fire
•Isolate the fire allowing the fuel to be used up
Doing any or all of the following stops corrosion:
•Stop Water from going to the surface
•Stop Oxygen from moving to the metal
•Remove Ion potential
1
valspar

# Improved Corrosion Protection

## Zinc Performance

Elements of Corrosion






Doing any or all of the following stops corrosion:
- Stop Water from going to the surface
- Stop Oxygen from moving to the metal
- Remove Ion potential

**Solvent-borne / Zinc Based Coatings:**
- To stop corrosion, zinc based coatings remove the Ion potential
- To accomplish the removal, the Zinc "sacrifices" itself, degrading, to slow the rusting process
- The "sacrifice" produces a larger rough area than Valspar Aquaguard™



| | | |
|---|---|---|
| Topcoat | KXR0306 | 40 – 50 micron |
| Mid Primer | EXY0090 | 40 – 50 micron |
| Primer | EEG0032 | 25 micron |

## Valspar Aquaguard™ Performance

Elements of Corrosion






Doing any or all of the following stops corrosion:
- Stop Water from going to the surface
- Stop Oxygen from moving to the metal
- Remove Ion potential

**Valspar Aquaguard™ Waterborne Coatings:**
- Prevents water from reaching the surface to mix with Oxygen
- Prevents Oxygen from reaching the metal
- Performs without "sacrificing" itself, holding corrosion to smaller area

| | | |
|---|---|---|
| Aquaguard™ Topcoat | WLR0161 | 40 – 50 micron |
| Mid Primer | WLR0009-P | 50 – 60 micron |
| Primer | Zinc Rich Shop Primer | 10 micron |

# Improved Corrosion Protection

- Valspar Aquaguard™ outperformed standard solvent-based coatings with zinc in this 710 Hour Salt Spray Test.
- On average the corrosion is reduced by at least 60% on tested areas.

## Solvent-Borne Control Panel



| | | |
|---|---|---|
| Topcoat | KXR0306 | 40 – 50 micron |
| Mid Primer | EXY0090 | 40 – 50 micron |
| Primer | EEG0032 | 25 micron |

Before Testing — After 710 Hours Salt Spray Exposure

Corrosion resistance of this zinc rich primer, epoxy mid coat and acrylic topcoat industry control.

The corrosion cell, (defined as the area below the coating substrate interface) was measured at 310 micron wide and a pit depth of 95 micron.

***The depth of pit shows just how far into the container the corrosion was able to reach.***

## Aquaguard™ System



| | | |
|---|---|---|
| Aquaguard™ Topcoat | WLR0161 | 40 – 50 micron |
| Mid Primer | WLR0009-P | 50 – 60 micron |
| Primer | Zinc Rich Shop Primer | 10 micron |

Before Testing — After 710 Hours Salt Spray Exposure

The corrosion cell was reduced by approximately 60% compared to the Panel 1 control.

***There is noticeably less red rust inside the scribe.***

valspar

if it matters, we're on it.®

## The Science of Superior Performance.

Valspar used Scanning Electron Microscopy (SEM) to determine the functionality of the coatings on the metal surface to determine what is happening in between the coating layers, and to evaluate the corrosion cell at the scribe after exposure to a corrosive environment.

**Purpose:** The goal was to determine what types of mechanisms were being deployed to provide enhanced performance of the Aquaguard™ coating system after application and during exposure to a corrosive environment.

**Procedure:** All coatings were applied over shot blasted steel. Panels were exposed to 710 hours of salt spray exposure. Exposed and Unexposed panels were analyzed using SEM instrumentation. Corrosion on the exposed panels was analyzed at the scribe area. The standard zinc rich primer, epoxy mid coat, and acrylic topcoat system was used as a control.

### Solvent-Borne Control Panel



| | | |
|---|---|---|
| Topcoat | KXR0306 | 40 – 50 micron |
| Mid Primer | EXY0090 | 40 – 50 micron |
| Primer | EEG0032 | 25 micron |



**Before Testing**



**After 710 Hours Salt Spray Exposure**

Corrosion resistance of this zinc rich primer, epoxy mid coat and acrylic topcoat industry control. The corrosion cell, (defined as the area below the coating substrate interface) was measured at 310 micron wide and a pit depth of 95 micron.

***The depth of pit shows just how far into the container the corrosion was able to reach.***

### Aquaguard™ System



| | | |
|---|---|---|
| Aquaguard™ Topcoat | WLR0161 | 40 – 50 micron |
| Mid Primer | WLR0009-P | 50 – 60 micron |
| Primer | Zinc Rich Shop Primer | 10 micron |



**Before Testing**



**After 710 Hours Salt Spray Exposure**

The corrosion cell was reduced by approximately 60% compared to the Panel 1 control.

***There is noticeably less red rust inside the scribe.***

The Science of Superior Performance.







## Observations:

- SEM analysis was unable to distinguish any chemical bonding or changes in chemistry at the interfacial areas.
- The Aquaguard™ primer full encapsulates the shot blast metal when applied at 50 micron of total dry film.
- The zinc rich shop primer applied between 10 and 50 microns encapsulates the shot blast metal profile. The Aquaguard™ primer adheres directly to the zinc rich primer, and bonds to the metal at any exposed area of the substrate that the shop primer missed.
- The combination of the Aquaguard™ coatings high density, chemical adhesion, and anticorrosive properties provides superior corrosion protection compared to the standard zinc rich primer, epoxy mid coat, and acrylic.
- The combination of the zinc rich shop primer, Aquaguard™ mid coat, and Aquaguard™ topcoat provides a synergistic positive effect on anticorrosive properties compared to the current solvent based control.

## Conclusions:

***The Aquaguard™ primer and topcoat system has...***

- **Superior performance** as a DTM and or when used in combination with a zinc rich shop primer in the steel container industry.
- Provides barrier protection that **prevents the start of the corrosion cell** at the metal interface when applied at the recommended film thicknesses. This protection is further enhanced over the zinc rich shop primer.
- **Slows the growth of the corrosion cell** in damaged areas of the film, **reduces the width of corrosion** at the scribe, and **reduces the depth of pitting** into the metal substrate at the scribe.

**For more information on Aquaguard™ visit www.valsparaquaguard.com or e-mail valsparaquaguard@valspar.com.**




The data on this sheet represent typical values. Since application variables are a major factor in product performance, this information should serve only as a general guide. Valspar assumes no obligation or liability for use of this information. **Unless Valspar agrees otherwise in writing, Valspar makes no warranties, expressed or implied, and disclaims all implied warranties including warranties of merchantability for fitness for a particular use of freedom from patent infringement. Valspar will not be liable for any special, incidental or consequential damages.** Your only remedy for any defect in this product is the replacement of the defective product, or refund of its purchase price, at our option.

# EXHIBIT "B"

412.788.1300
412.788.1306 Fax
http://www.kta.com
e-mail: info@kta.com



**KTA-TATOR, INC.**

**115 Technology Drive, Pittsburgh, PA 15275**

October 20, 2008
Via email: *tmathews@valspar.com*

Mr. Tom Mathews
Valspar Corporation
828 Rolling Wood Lane
Ft. Wayne, IN 46846

**SUBJECT: Results of Testing in Accordance with IICL Specification; KTA-Tator, Inc. Project No. 280479A1**

Dear Mr. Mathews:

In accordance with KTA-Tator, Inc.'s (KTA) Proposal Number PN080520 and subsequent Authorization to Proceed dated July 17, 2008, KTA has tested one (1) exterior coating system in accordance with the general and detailed procedures of the Institute of International Container Lessors (IICL). This report is issued in addition to the testing report dated October 17, 2008. This report contains details of the coating application and testing procedures, as well as the results of the corrosive and mechanical evaluations conducted on the specimens.

## SUMMARY

One (1) coating system was applied and tested according to the exterior coating system regime prescribed in the IICL specification (March, 1996). The minimum total score suggested by IICL is 70 points for exterior systems, and the maximum achievable point total is 100. IICL suggests a minimum of 55 points for the corrosive group (out of a possible 70), 15 points minimum for the mechanical group (out of a possible 25), and no minimum score for the cosmetic group (out of a possible 5). The corrosive group tests include degree of blistering, degree of rusting, and undercutting. The mechanical group tests include adhesion and impact resistance. The cosmetic group tests include color and gloss. Individual data for each of the tests conducted are contained in Tables 2 through 6 (appended). The numerical scores for the system are contained in Table 1 below.

**Table 1 – Tabulation of Test Scores According to IICL Specification**

| Coating System Shop Primer/Primer/Topcoat | Corrosive Group Points | Mechanical Group Points | Cosmetic Group Points | Total Points |
|---|---|---|---|---|
| Aquaguard™ P-107 (2.0-2.5 mils)/ Aquaguard™ T-717 (Ver. 2, 1.5-2.0 mils) | 70 | 16 | 3 | **89** |

## SPECIMEN PREPARATION

The specimens were prepared for testing by KTA. Twelve (12) 3″ x 6″ x 1/16″ hot-rolled steel panels were solvent cleaned and then abrasive blast cleaned to a cleanliness of ISO Sa 2 1/2 (SSPC SP10). The surface profile depth was measured with Testex tape, and the values measured ranged from 2.0 to 2.3 mils. Valspar Corporation provided the two (2) coatings to be applied, mixing instructions, film thicknesses, and bake schedules. All coating application was performed with Binks 2001 conventional spray application equipment.

The coatings were mixed and applied according to the coating system matrix and instructions provided by Valspar Corporation. The Aquaguard™ P-107 coating was allowed to set at ambient laboratory conditions (approximately 23°C and 50% RH) for 10 minutes, then was baked in an oven for 10 minutes at 60°C. The Aquaguard™ T-717 coating was allowed to set at ambient conditions for 10 minutes prior to baking for 15 minutes at 60°C. No reducer was used in the coating applications.

Dry film thickness (DFT) measurements were obtained on each of the panels using a PosiTector® 6000. Because of time involved with obtaining the measurements, the coatings were not applied in rapid succession as they would be in a product assembly line. The individual cumulative DFT measurements for each coating layer are reported in Table 7 (appended). The panels were allowed to cure for seven (7) days at ambient laboratory conditions prior to testing. Panels were chosen for exposure based on the dry film thickness values of each individual layer and how they corresponded to the manufacturer's recommended range. Ten (10) panels, front or back, were chosen for panels which the thicknesses were within the range (as indicated in Table 7). In the case that both front and back sides or greater than ten (10) panels were within the specified range, the panels with the film thickness closest to the middle of the recommended range were chosen.

## LABORATORY INVESTIGATION

The laboratory investigation consisted of testing and evaluation of one (1) coating systems. Descriptions of testing procedures and results are provided below.

Prior to testing, two (2) panels were scribed with two (2) scribe lines using a tungsten carbide tip. Color and gloss determinations were performed on a separate designated panel. Color determinations were performed with a Hunter Miniscan XE Plus with parameters D65

(daylight illuminant) and 10° standard observer, in accordance with ASTM D 2244. Readings were taken in triplicate, on the L*a*b* scale. Gloss measurements were also performed on the same designated panel with a Gardner Byk 60° gloss meter in accordance with ASTM D 523. Four (4) replicates were obtained. The averages prior to and following exposure, ΔE* calculation, and corresponding earned point values are contained in Table 2 (appended).

Ten (10) panels were subjected to eight (8) exposure cycles as prescribed in the IICL specification. Each cycle consisted of 72 hours UV cycling exposure. Each UV cycle consisted of eight (8) hours ultraviolet exposure at 60°C using UVA-340 bulbs, followed by four (4) hours of condensing humidity at 50°C. This twelve (12) hour sub-cycle was repeated six (6) times, for a total of 72 hours. Following the ultraviolet exposure, the panels were placed into a Q-Fog cabinet and subjected to 96 hours of prohesion cycling using a solution of 0.35% (wt) ammonium sulfate and 0.05% (wt) sodium chloride solution with a pH of 5.0 to 5.4. Each prohesion cycle consisted of four (4) hours fog at 30°C and two (2) hours dry air at 40°C. This sub-cycle was repeated sixteen (16) times. This regime constituted one (1) cycle, and was repeated seven (7) more times, for a total of fifty-six (56) days.

Within one (1) hour of completion of the exposure, the panels were subjected to various tests as outlined below. The designated panel was evaluated for degree of blistering in accordance with ASTM D 714, degree of rusting in accordance with ASTM D 610, and color and gloss as described above. For the color and gloss determinations, the unit values from Tables 4.7 and 4.8 were equal to the earned point values reported. The value obtained from Section 4.1 of the IICL specification from the associated blistering rating was multiplied by 0.75 to achieve the point value reported. For the degree of rusting determination, the value obtained from Section 4.2 of the IICL specification from the associated rusting rating was multiplied by 2.50 to achieve the point value reported. The results of the blistering and rusting determinations as well as the corresponding earned point values are contained in Table 3 (appended).

One (1) scribed panel was evaluated for undercutting in accordance with Section 4.3 of the IICL specification. The unit value based on the amount of scribe creep from Table 4.3 was multiplied by 3.00 to obtain the point value assigned. The standard deviation for the panel did not exceed 50% of the average. The results of the undercutting determination and corresponding point value are contained in Table 4 (appended).

One (1) panel was evaluated for adhesion in accordance with ASTM D 3359, Method B, using 2 mm spacing between incisions. For the adhesion determinations, the unit value from Table 4.4 of the IICL specification is equal to the earned point value. The results of the adhesion testing and corresponding earned point values are contained in Table 5 (appended). Two (2) panels were tested for impact resistance, both direct and reverse, in accordance with ASTM D 2794. A low-voltage holiday detector was used to inspect for cracking. Unit values were assigned per Tables 4.5.1, 4.5.2, and 4.5.3 of the IICL specification. The unit value was multiplied by 0.50 to obtain the point value for each impact test. The results of the impact tests and associated point values are contained in Table 6 (appended).

If you have any questions or comments regarding this report, please do not hesitate to please call me at 412.788.1300 ext. 181, or email me at cpravlik@kta.com.

Very truly yours,

**KTA-TATOR, INC.**

Carly M. Pravlik
Physical Laboratory Supervisor

CMP/CLO/WDC:kdw
Attachments
JN280479A1
*(280479 ValsparIICL.doc)*

**A1** – Addendum to report dated October 17, 2008. Irrelevant information excluded.

**NOTICE:** This report is issued in conformance with generally acceptable industry practices. While customary precautions were taken to insure that the information gathered and presented is accurate, complete and technically correct, it is based on the information, data, time, materials, and/or samples afforded. This report should not be reproduced except in full.

**Table 2 – Results of Color and Gloss Determinations**

| Individual Panel ID | Pre-Exposure Average Color Determination | Post-Exposure Average Color Determination | ΔE* | Corresponding Color Point Value | Pre-Exposure Average Gloss Determination | Post-Exposure Average Gloss Determination | ΔGloss | Corresponding Gloss Point Value |
|---|---|---|---|---|---|---|---|---|
| 13 | L* 69.25<br>a* -0.89<br>b* -2.86 | L* 68.07<br>a* -0.91<br>b* -2.73 | 1.2 | **3** | 18.5 | 5.4 | -71% | **0** |

**Table 3 – Results of Degree of Blistering and Degree of Rusting Evaluations**

| Individual Panel ID | Degree of Blistering Rating | Corresponding Blister Point Value | Degree of Rusting Determination | Corresponding Rusting Point Value |
|---|---|---|---|---|
| 23 | 10 | **15** | 10 | **25** |

**Table 4 – Results of Undercutting Evaluations**

| Individual Panel ID | Average Scribe Creep Determination (mm) | Corresponding Point Value |
|---|---|---|
| 16 | 1 | **30** |

**Table 5 – Results of Adhesion Testing**

| Individual Panel ID | Average Adhesion Rating | Corresponding Point Value |
|---|---|---|
| 23 | 5B | **15** |

**Table 6 – Results of Impact (Direct and Reverse) Testing**

| Individual Panel ID (Direct) | Direct Impact Result (inch-pounds) | Corresponding Direct Impact Point Value | Individual Panel ID (Reverse) | Reverse Impact Result (inch-pounds) | Corresponding Reverse Impact Point Value |
|---|---|---|---|---|---|
| 22 | 25 | **0** | 13 | 3 | **1** |

**Table 7 – Dry Film Thickness Measurements – Group 2 Only**

| Panel No. | Assigned Group # | Cumulative Coating Thickness Data (mils) | | | | | | | | | Side Chosen for Exposure |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Layer | Front 1 | Front 2 | Front 3 | Back 1 | Back 2 | Back 3 | Front Average | Back Average | |
| 13 | 2 | Primer | 1.9 | 1.8 | 2.0 | 2.1 | 2.1 | 2.2 | 1.9 | 2.1 | Back |
| | | Topcoat | 3.9 | 4.3 | 4.7 | 4.1 | 4.2 | 4.6 | 4.3 | 4.3 | |
| 14 | 2 | Primer | 1.9 | 2.1 | 2.6 | 2.0 | 2.2 | 2.6 | 2.2 | 2.3 | |
| | | Topcoat | 3.9 | 4.1 | 5.0 | 4.5 | 4.8 | 5.1 | 4.3 | 4.8 | |
| 15 | 2 | Primer | 1.8 | 2.1 | 2.4 | 1.6 | 1.9 | 2.3 | 2.1 | 1.9 | Front |
| | | Topcoat | 3.6 | 4.3 | 4.4 | 3.6 | 3.9 | 4.2 | 4.1 | 3.9 | |
| 16 | 2 | Primer | 1.7 | 2.0 | 2.0 | 2.1 | 2.1 | 2.3 | 1.9 | 2.2 | Front |
| | | Topcoat | 3.9 | 4.2 | 4.1 | 4.1 | 4.4 | 5.1 | 4.1 | 4.5 | |
| 17 | 2 | Primer | 2.3 | 2.3 | 2.5 | 2.4 | 2.6 | 2.6 | 2.4 | 2.5 | Front |
| | | Topcoat | 4.0 | 4.5 | 4.6 | 4.7 | 5.1 | 5.2 | 4.4 | 5.0 | |
| 18 | 2 | Primer | 1.9 | 1.8 | 2.2 | 1.9 | 2.2 | 2.7 | 2.0 | 2.3 | Front |
| | | Topcoat | 4.0 | 4.0 | 4.4 | 4.0 | 4.8 | 5.1 | 4.1 | 4.6 | |
| 19 | 2 | Primer | 2.0 | 2.3 | 2.3 | 1.8 | 1.7 | 1.8 | 2.2 | 1.8 | Front |
| | | Topcoat | 3.7 | 4.3 | 4.1 | 3.6 | 4.2 | 4.0 | 4.0 | 3.9 | |
| 20 | 2 | Primer | 1.7 | 2.0 | 2.4 | 1.9 | 1.9 | 2.1 | 2.0 | 2.0 | Front |
| | | Topcoat | 4.0 | 4.1 | 4.8 | 4.0 | 4.1 | 4.8 | 4.3 | 4.3 | |
| 21 | 2 | Primer | 1.4 | 2.1 | 2.3 | 1.6 | 2.1 | 2.3 | 1.9 | 2.0 | Back |
| | | Topcoat | 3.1 | 3.9 | 4.5 | 3.5 | 4.2 | 4.5 | 3.8 | 4.1 | |
| 22 | 2 | Primer | 1.8 | 2.2 | 2.7 | 1.6 | 2.0 | 2.4 | 2.2 | 2.0 | Front |
| | | Topcoat | 3.5 | 4.0 | 4.6 | 3.0 | 3.7 | 4.3 | 4.0 | 3.7 | |
| 23 | 2 | Primer | 1.7 | 1.9 | 2.2 | 2.5 | 2.6 | 2.3 | 1.9 | 2.5 | Back |
| | | Topcoat | 3.2 | 3.6 | 4.4 | 3.8 | 4.2 | 3.8 | 3.7 | 3.9 | |
| 24 | 2 | Primer | 1.9 | 2.5 | 2.7 | 2.1 | 2.3 | 2.3 | 2.4 | 2.2 | Back |
| | | Topcoat | 3.8 | 4.4 | 4.9 | 3.4 | 4.0 | 3.7 | 4.4 | 3.7 | |

# EXHIBIT "C"



**SEA BOX®, INC.**

Shipping and Storage Containers • Custom Shelter Solutions and Modifications
Corporate Headquarters: 802 Industrial Highway • East Riverton, New Jersey USA 08077-1910
Tel. (856) 303-1101 • Fax (856) 303-1501
www.seabox.com

# MANUFACTURING AGREEMENT

This Manufacturing Agreement is made to be effective this 4th day of August 2010 by and between **SEA BOX, INC.**, 802 Industrial Highway, East Riverton, NJ 08077, a New Jersey corporation, and **THE VALSPAR CORPORATION**, 901 3rd Avenue South, Minneapolis, MN 55402, a Delaware corporation.

**WHEREAS,** the two parties to this Manufacturing Agreement ["the "Agreement"] are Sea Box, Inc. ["Sea Box"] and The Valspar Corporation, on behalf of itself and certain of its affiliates ["Valspar"]. Collectively, they shall hereinafter be referred to as "the Parties."

**WHEREAS,** Sea Box is in the business of designing, developing, marketing, manufacturing and selling various kinds and types of shipping and storage containers. All of these kinds and types of containers shall individually or collectively be hereinafter identified as "Containers."

**WHEREAS,** Valspar is in the business of manufacturing coatings and coating intermediates, including coatings of the type and kind normally used by Sea Box or its suppliers, subcontractors and vendors in the manufacture of Containers or certain components from which Containers are manufactured. All of these kinds and types of coatings shall individually or collectively be hereinafter identified as "Coatings." Valspar has frequently in the past sold such Coatings to Sea Box or its suppliers, subcontractors and vendors.

**WHEREAS,** the Parties are desirous of establishing a long-term agreement whereby Valspar shall manufacture and provide Coatings for the benefit of Sea Box, and Sea Box or its suppliers, subcontractors and vendors shall purchase such Coatings from Valspar. This, then, is the purpose of this Agreement.

**WHEREAS,** the Parties intend that this Agreement specify certain rights and obligations as to each of them so that they may mutually cooperate and satisfy the purpose of this Agreement.

**NOW, THEREFORE,** in consideration of the premises and promises herein contained, and on Schedule "A" attached hereto, the Parties agree to the following.

1. During the term of this Agreement, Sea Box will purchase from Valspar, and Sea Box will specify that its suppliers, subcontractors and vendors purchase from Valspar, as applicable, one-hundred percent (100%) of the Coatings which Sea Box itself requires for the manufacture of Containers and which its suppliers, subcontractors and vendors require for the manufacture of Containers on behalf of Sea Box. Sea Box's Coatings requirements will vary during the Agreement's term. However, Sea Box need not specify that its suppliers, subcontractors and vendors purchase from Valspar in connection with any Container sale or sales to any Sea Box

customer when such customer specifies in writing that coatings manufactured or produced by a firm other than Valspar are to be used. This writing may be satisfied, for example, by a customer's statement of work, its technical specification requirements or other similar language, as such may appear in a request for quotation, request for proposal, invitation for bid or a reasonably similar document.

2. As of the effective date of this Agreement, Sea Box's suppliers, subcontractors and vendors are identified by the Parties as Hercules (USA), Brigantine (Hong Kong) and CIMC (China). The Parties' obligations during the term of this Agreement will extend to any additional suppliers, subcontractors and vendors from which Sea Box purchases Containers.

3. Valspar agrees to timely manufacture and supply to Sea Box and its suppliers, subcontractors and vendors, all those quantities of Coatings which have been ordered by Sea Box or its suppliers, subcontractors and vendors which are required for their manufacture of Containers for Sea Box, based on lead times agreed by the Parties.

4. Valspar agrees to sell the Coatings identified in paragraph 1, above, to Sea Box and its suppliers, subcontractors and vendors, at such prices which appear on Attachment A to this Agreement.

a. Such pricing is subject to change [adjustment], upward or downward, upon thirty (30) days prior written request by either party to the other. An adjustment may be requested by either party upon a five (5) percent or greater change, upward or downward, in the cost of producing any Coatings, such cost change to be evidenced by (i) the National Paint & Coatings Association [NPCA] raw material cost index, or (ii) Valspar-specific cost information provided by Valspar. No adjustment request may be made by either party from the pricing then in effect until the costs for Coatings change by at least five (5) percent, upward or downward, from the costs used to establish the prior price. The initial cost or index base from which future price changes will begin to be measured will be the latest NPCA index published as of the effective date of this Agreement [such index which is subject to the NPCA's later revision]. Any upward or downward pricing adjustments will not affect orders which have already been placed by Sea Box or its suppliers, subcontractors and vendors. If either party requests a price adjustment based on a cost change of five (5) percent or more as provided in this paragraph, and the other party gives written notice that it does not accept the price adjustment during the thirty (30) day notice period, the Parties shall discuss the proposed price adjustment, and if the Parties do not reach agreement on a price adjustment during the thirty (30) day notice period, either party may terminate this Agreement upon a further written notice of not less than sixty (60) days. In addition, if Valspar requests a price adjustment based on a cost change of five (5) percent or more as provided in this paragraph, and Valspar's request is based on Valspar-specific cost information that exceeds the change in the NPCA index for the same period, Sea Box shall have the right during the thirty (30) day notice period to seek quotes from other suppliers to supply the Coatings subject to the price adjustment request. If another supplier of the affected Coatings (or their reasonable equivalent) offers Sea Box during the thirty (30) day notice period similar quantities at a lower delivered price on similar terms and conditions as set forth in the Agreement, Sea Box shall give Valspar written notice of the material terms of such offer, and then Valspar shall within seven (7) days of such notice either (i) meet the lower price or (b) Sea

Box shall be free to purchase the affected Coatings from such other supplier while the lower price remains in effect, and the affected Coatings purchased from such other supplier shall not be subject to the terms of this Agreement.

b. Valspar has in the past negotiated prices separately with Sea Box's suppliers, subcontractors and vendors (currently identified by the Parties as Hercules (USA), Brigantine (Hong Kong) and CIMC (China)) and may continue to do so. If Valspar requests a price adjustment from any Sea Box supplier, subcontractor or vendor, Valspar shall give Sea Box contemporaneous written notice of the price adjustment request and prompt written notice of any price adjustment agreed with any Sea Box supplier, subcontractor or vendor.

c. The Terms and Conditions of sale of Coatings between Valspar and Sea Box's suppliers, subcontractors and vendors shall be as agreed between such parties, except for (i) pricing which has been predetermined in accordance with Attachment A, subject to adjustment(s) in accordance with subparagraphs 4.a. and b., and (ii) warranty provisions (included in Attachment B), which are to be the same as established for Sea Box as part of this Agreement.

5. Prior to the date of this Agreement, Sea Box asserted claims against Valspar relating to adhesion problems on certain Sea Box 10 foot Bicon Containers coated at Brigantine (Hong Kong) between January 2009 and June 2009 and located at Holloman AFB in New Mexico; Soleuvre, Luxembourg; Al Udeid, Qatar; and Thumrait, Oman, in connection with Containers furnished by Sea Box to the U.S. Air Force under the Basic Expeditionary Airfield Resources (BEAR) program contract. Valspar provided the AQUAGUARD coating system applied to the Containers. The Containers were manufactured, assembled, zinc-primed and coated by other parties. Valspar has already supplied substantial quantities of paint for repairs to the affected Containers at no charge to Sea Box. Sea Box has incurred expenses to repair the paint finish on affected Containers located in New Mexico and Luxembourg and may incur additional expense to repair the finish on additional affected Containers located in the Middle East. Valspar does not believe that its Coatings are responsible for the adhesion problems on the Containers, but has agreed to contribute toward Sea Box's expenses as a valued business partner. Valspar and Sea Box have agreed to the following to settle these claims:

a. Valspar agrees to provide to Sea Box or its suppliers, subcontractors and vendors the Coatings required (not to exceed 4,500 gallons) for the refurbishment of any Containers furnished by Sea Box to the U.S. Air Force under the Basic Expeditionary Airfield Resources (BEAR) program contract which have been, or may be, identified by the U.S. Air Force as non-conforming with respect to the original or replacement Coatings finish. This refurbishment material will be provided by Valspar at no cost.

b. Within sixty (60) days following the effective date of this Agreement, Valspar will pay the sum of Two Hundred Thousand Dollars ($200,000.00) to Sea Box.

c. Valspar has agreed to provide Sea Box with the rebates set forth in paragraph 7 of this Agreement.

d. Sea Box releases Valspar and all its subsidiaries, affiliates and employees, from any and all damages, liabilities, or claims of any nature that relate to or arise out of the purchase, application, performance or use of Valspar Coatings on Containers referenced in this paragraph, including but not limited to all claims arising out of or related to the failure of the Coatings to adhere to the Containers. This release specifically includes a release of all expenses, liability and obligations for repainting the Containers, except that it does not release Valspar's warranty obligations (as set forth in Attachment B) for Coatings supplied by Valspar for use in refurbishing the affected Containers. No party admits any fault as a result of this settlement and release. The terms of this settlement and release are confidential.

6. Reserved.

7. Valspar agrees to rebate to Sea Box a certain percentage of the net purchases by Sea Box or its suppliers, subcontractors and vendors of Coatings from Valspar to be used when manufacturing Sea Box Containers. Following the effective date of this Agreement, Valspar will remit all rebates accumulated during each calendar quarter for orders placed during that quarter by check to Sea Box within thirty (30) days after the end of each quarter. For the first year of this Agreement, rebate calculations will begin and be effective with purchases beginning June 7, 2010. Valspar will provide Sea Box with a written report of the basis for all rebates paid, by purchasing entity, with each remittance. Accumulated rebates will not be considered credits to be applied against open invoices unless Sea Box has not received them by the fifth day after such rebates were payable. However, Valspar's payment of rebates otherwise due to Sea Box may be delayed until any past due Sea Box invoice balance payable to Valspar has been settled.

The rebate schedule during each year of this Agreement shall be as follows:

First Year: Ten (10) percent
Second Year: Ten (10) percent
Third Year: Six (6) percent
Fourth Year: Five (5) percent
Fifth Year: Five (5) percent

Following the end of the fifth year, and for so long as the Parties may continue this Agreement, the rebate shall be five (5) percent unless changed in a writing signed by both Parties.

Prices appearing on Attachment A are F.O.B. Valspar's facility. Payment terms for Sea Box are "Net - 45 Days," but Valspar reserves the right to change or suspend credit terms or shipments if Sea Box fails to pay invoices not subject to a good faith dispute when due or suffers a material adverse change in financial condition.

8. Sea Box's suppliers, subcontractors and vendors are independent contractors and are not Sea Box's affiliates. Accordingly, Valspar agrees that Sea Box has no liability whatsoever for amounts owed to Valspar by such suppliers, subcontractors and vendors.

9. The Parties further agree to take all necessary and appropriate steps to safeguard the confidential and proprietary information concerning these activities and belonging to each of the

them, as provided in this paragraph. This Agreement is considered strictly confidential to both Parties. Accordingly, for the duration of this Agreement and for a period of five (5) years thereafter, no part of this Agreement, its Terms and Conditions or Attachments, or information directly or indirectly related to the orders placed by Sea Box and its suppliers, subcontractors and vendors, is to be disclosed to any person or entity. Additionally, for the duration of this of this Agreement and for a period of five (5) years thereafter, Valspar shall not disclose information directly or indirectly related to its transactions with any Sea Box supplier, subcontractor or vendor to any other Sea Box supplier, subcontractor or vendor.

The obligations of the Parties to preserve and protect the confidentiality of this Agreement and its terms applies to both parties, except as necessary for them to perform under this Agreement. Both Parties agree to require their own employees to preserve and protect such confidentiality.

For the duration of this Agreement and a period of five (5) years thereafter, the Parties shall also protect as confidential any written information (data, drawings, designs, specifications, or any other technical and production information) in any media (including electronic) which is marked as "Confidential" by the disclosing party, or which, if orally disclosed and so identified when disclosed, is confirmed as confidential in writing by the disclosing party to the receiving party within ten days. The obligations of confidentiality set forth in this paragraph does not apply to information that the receiving party can establish (i) is publicly available or becomes publicly available through no fault of the receiving party, (ii) is received by the receiving party from a third party not subject to an obligation of confidentiality to the disclosing party or (iii) is independently developed by the receiving party without reference to confidential information of the disclosing party.

10. Neither Valspar nor Sea Box may assign its rights and obligations under this Agreement to any other entity, organization or individual without the prior written consent of the other, such consent which shall not be unreasonably withheld.

11. This Agreement will terminate five (5) years after its effective date set forth in the opening paragraph of this Agreement. The Parties may subsequently agree in writing to extend this Agreement for any period acceptable to both, or they may subsequently agree in writing to reduce its term.

12. In case of a party's substantial breach of its obligations and/or duties under this Agreement, the non-breaching party has the option of terminating the Agreement upon seven (7) day prior written notice to the other.

The following events, *inter alia*, shall constitute a substantial breach under this Agreement:

a. A material adverse change in a Party's financial condition, including, without limitation, the filing of a bankruptcy petition under Title 11, United States Code, by or against the party, a general assignment by a party for the benefit of its creditors, and the inability of a party generally to pay its debts as they come due.

b. Except for causes reasonably beyond its control, or due to *force majeure*, failure by Valspar to timely deliver the Coatings orders it has accepted in accordance with the delivery schedule(s) therein.

c. Failure by Valspar to cure specification non-conformities within thirty (30) days or failure to honor its warranty.

d. Failure by Sea Box to pay an invoice which is not subject to a good faith dispute when due twice or more in any six (6) month period.

13. If either party substantially breaches this Agreement, all of its obligations to the other (non-breaching) party shall survive termination of this Agreement. Additionally, the non-breaching party may bring suit in law or equity.

14. The Parties are at all times considered to be Independent Contractors, with neither considered to have the power to control the other. In making this Agreement and performing under it, the Parties act and shall act at all times as independent contractors. Nothing contained in this Agreement shall be construed to create between the Parties or any of the Parties' agents, subcontractors, and the like, the relationship of partners, joint venturers, or associates in business; of employer and employee; of representative or agent and principal; of co-tenants; or of any relationship other than that of independent contractors. Neither party has authority to bind or represent the other individually or collectively in any manner or matter whatsoever, nor is either party authorized to incur debts, expenses or other obligations of any kind in the name of, or as agent for, the other. Neither party shall be liable to the other party for any debts, accounts, obligations, and other liabilities of the other party to third parties, including agents or employees.

15. This Agreement and its terms and conditions shall be governed by, construed, and enforced in accordance with the laws of the State of Minnesota, without regard to any choice of law principles. The Parties hereby agree and irrevocably consent to submit to the exclusive jurisdiction and venue of the courts of the State of Minnesota or of the State of New Jersey, and of the United States of America located in such states, the state of venue to be in the state where the headquarters of the defendant is located, in any action for any and all claims or disputes arising from or related to this Agreement.

16. Each party shall continue to own all copyrights, patents, trademarks, services marks, trade secrets and any other proprietary rights that such party owned immediately prior to this Agreement. Intellectual property which is developed solely by one party during the term of this Agreement shall belong exclusively to that party. No intellectual property shall be deemed to be jointly developed or owned, unless the Parties have entered into a separate written agreement regarding intellectual property to be jointly developed or owned.

17. If any provision of this Agreement is held to be invalid or unenforceable for any reason by a court of competent jurisdiction, the remaining provisions will continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but by limiting such provision it would become valid and enforceable, then such provision will be deemed to be written, construed, and enforced as so limited. If the court declines to so modify or supplement such a provision, then it shall be severed from this Agreement and the

remaining provisions of this Agreement shall continue in force and effect as stated above unless such deletion makes this Agreement impossible to perform.

18. This Agreement expresses the full and complete understanding of the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous proposals, agreements, representations and understandings, whether written or oral, with respect to the subject matter. This Agreement may not be amended or modified except in writing signed by each of the parties to the Agreement. This Agreement shall be construed as to its fair meaning and not strictly for or against either party.

19. This Agreement incorporates Attachment B (Other Terms and Conditions) which describes the exclusive terms of the warranty offered by Valspar for the Coatings.

20. The signatories executing this Agreement on behalf of their respective companies represent and warrant that he or she has all requisite authority to bind that party to the terms of this Agreement. This Agreement may be signed in counterparts, which together shall constitute one agreement.

21. The headings and captions of this Agreement wherever they may appear are inserted for convenience of reference and do not define, limit or describe the scope or intent of this Agreement or any particular section, paragraph, or provision.

22. All notices shall be in writing. Notices shall be deemed delivered when delivered by Certified or Registered Mail, Return Receipt Requested (as evidenced by a signed postal service return receipt), on the date of delivery when delivered by overnight or other courier (as evidenced by the receiving party's signature) or by hand, to the addresses set forth on the signature page which follows. A notice will be deemed to have been delivered to a party if it refuses to accept delivery of Certified or Registered Mail after three attempts by the U.S. postal service or if it refuses to accept delivery by overnight or other courier after one attempt by the courier.

23. Neither party is liable to the other party for any delay in performance or non-performance directly or indirectly caused by, or in any manner arising from, any cause or causes (whether or not of a similar nature to those listed below) beyond a party's reasonable control, including but not limited to, fires, floods, riots, acts of God, wars or other conflicts, governmental interference or embargoes, strikes, inability to obtain raw materials, organized labor difficulties or acts by the other party, except that payment obligations hereunder are not excused. If a party becomes aware of a cause that may affect its performance, it must notify the other party as soon as practicable, and the Parties will cooperate to minimize the disruption arising from such cause or causes.

[This space intentionally left blank. Signature page follows.]

(Signature Page)

**IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as set forth below.**

The Effective Date of this Agreement shall be the latest date set forth below.

This Agreement is executed on behalf of The Valspar Corporation by its duly authorized representative, this 4th day of August, 2010.

**THE VALSPAR CORPORATION**
901 3rd Avenue South
Minneapolis, MN 55402

BY: ______________________
Signature

Brian J Falline VP Gen Mgr Ind.
Printed Name & Title

This Agreement is executed on behalf of **Sea Box, Inc.** by its duly authorized representative, this 6 day of AUG, 2010.

**SEA BOX, INC.**
802 Industrial Highway
East Riverton, NJ 08077

BY: Terry A. Brennan
Signature

TERRY A. BRENNAN V.P. OPERATIONS
Printed Name & Title

ATTACHMENT A
(Pricing)

[See attached pricing spreadsheet]

ATTACHMENT B
(Other Terms and Conditions)

[See attached Warranty Terms and Conditions]

valspar
If it matters, we're on it.

ATTACHMENT A

**Price Quote Form**

**Sea Box Name and Address:** Sea Box, Inc.
802 Industrial Highway
East Riverton, NJ 08077

**Quotation Number:**
**Quotation Date:** 7/1/2010
**Sea Box Number**
**Contact Name:** Jim Brennan

| SEA BOX PART NUMBER | VALSPAR PRODUCT NUMBER | PRODUCT DESCRIPTION | CONTAINER TYPE | UOM | BREAK QTY | PRICE |
|---|---|---|---|---|---|---|
| **HERCULES – US** | | | | | | |
| | | | | | | [illegible] |
| | CEC0076 | EPOXY PRIMER CURING AGENT | 3/4 Gallon Fill | ¾ GAL | | $24.48 |
| | EEG0015 | VALGARD 120 low VOC ZINC RICH EPOXY PRIMER | Pail | GAL | | $50.37 |
| | KAG0119 | R-CURE 400 URETHANE 24533 SEAFOAM GREEN | Drum | GAL | | $32.32 |
| | N-1981A | MIL-P-53022 EPOXY PRIMER A (4 GAL FILLS) | Pail | GAL | | $33.64 |
| | N-1981B | MIL-P-53022 CATALYST B | Gallon Can | GAL | | $21.40 |
| | N-8045 | MIL-DTL-53039A CARC 1K 383 GREEN | Pail | GAL | | $47.26 |
| | N-8048 | MIL-DTL-53039A CARC 1K 686 TAN | Pail | GAL | | $44.55 |
| | PXD0036 | R-CURE 800 URETHANE FED STD 33446 TAN | Drum | GAL | | $29.88 |
| | PXD0038 | R-CURE 800 URETHANE FED STD 33303 TAN | Drum | GAL | | $29.88 |
| | PXG0039 | R-CURE 800 URETHANE FED STD 34094 FOREST GREEN | Drum | GAL | | $29.62 |
| | PXG0040 | R-CURE 800 URETHANE FED STD 34088 OLIVE GREEN | Drum | GAL | | $30.27 |
| | WLA2107 | AQUAGUARD 100 WB BLACK PRIMER | Drum | GAL | | $29.12 |
| | WLA2166 | AQUASPAR 400 FED STD 26492 GRAY | Drum | GAL | | $18.72 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | WLD0240 | AQUASPAR 400 FED STD 33446 TAN | Drum | GAL | | $18.72 |
| | WLG0090 | AQUASPAR 400 FED STD 34094 FOREST GREEN | Drum | GAL | | $18.72 |
| | WLG0091 | AQUASPAR 400 FED STD 34088 OLIVE DRAB | Drum | GAL | | $18.72 |
| | YXL0021 | VALFLEX 320 MAERSK BLUE | Pail | GAL | | $28.09 |
| | AAD0377.076 | TAN REPAIR | Spray Can | SPR | | $9.83 |
| | | **Spray Can Pricing** | **36-60 Cans** | **Spray** | | **$9.83** |
| | | | **66-360** | **Spray** | | **$8.07** |
| | | | **366-750** | **Spray** | | **$5.73** |
| | | | **756-2500** | **Spray** | | **$4.10** |
| **BRIGANTINE** | | | | | | |
| | | | | | [illegible] | **Price in USD/KG** |
| | WRA0014 | AQUAGUARD™P107 | | | 21.90 | 3.99 |
| | WRA2192-T | black primer | | | 21.45 | 4.23 |
| | WLA2160 | T717 PS36463 | | | 24.75 | 4.88 |
| | WLR0163 | T717 PS30166 | | | 18.35 | 2.98 |
| | WLW0218 | T717 FS37875 | | | 18.69 | 2.94 |
| | WLA2219 | Waterborne Paint # 26492 | | | 26.81 | 5.06 |
| | WLD0249 | AQUAGUARD™T717 FS33446 | | | 18.69 | 2.94 |
| | WLL0099 | Blue Fst-35044 | | | 24.75 | 4.88 |
| | WLL0084 | Blue RAL5010 | | | 20.25 | 3.69 |
| | WLR0162 | Red RAL3002 | | | 21.35 | 3.89 |
| | EEA0134 | Valgard 140 Zinc Rich Epoxy | | | 28.03 | 3.14 |
| | CEC0100 | Hardener for Valgard 140 Series | | | 16.24 | 4.08 |
| | YXC1459 | thinner | | | 3.16 | 1.39 |
| | | | | | | |

**XINHUI - CIMC**

| | | | | | [illegible] | Price in USD/KG |
|---|---|---|---|---|---|---|
| | EEA0134 | Valgard 140 Zinc Rich Epoxy | | | 28.03 | 3.14 |
| | CEC0100 | Hardener for Valgard 140 Series | | | 16.24 | 4.08 |
| | | | | | | |
| | | | | | | |

Attachment B

valspar

**Warranty Terms and Conditions**

1. **Limited Warranty.** The Valspar Corporation ("Seller") warrants to Container Manufacturer Name ("Buyer"), and only to Buyer, that the products purchased from Seller ("Products") will meet the following standards: 1) The coating system will not deteriorate equal to or more than Re3 (according to the European Scale of Degree of Rusting for Anti-corrosive Paint – The European Committee of Paint and Paint Inc. Manufacturers' Association); and 2) when visually inspected, the coating system will not have any continuous defective area of more than five percent (5%) of the entire coated surface of any individual container or flatrack [ten percent (10%) during years 4 and 5 of this warranty]. An area will not be considered to be defective where the coating film exhibits mud-cracking, fading, staining, discoloration, or loss of gloss as long as protection against corrosion meeting the standards of this section has been provided. If Buyer discovers within 5 years of manufacture date a failure of the Products to substantially meet such standards, Buyer must promptly notify Seller in writing within 30 days after Seller discovers or reasonably should have discovered the failure. Within a reasonable time after written notification of a failure and Seller's confirmation that the failure is covered by this Warranty, Seller will cover reasonable original material and labor costs to repair the failure on any container or flatrack properly coated with an approved Valspar coating system at the following rates: 100% of the costs for failures during the first 3 years; 80% in year 4, and 60% in year 5. This warranty applies if the failure is not the fault of the Buyer or the end user, and the proper preparation, pretreatment and application procedures as specified by Seller in writing for the Products and the coating system have been followed, including the film thicknesses specified below. Seller's liability under this warranty for any Products purchased during a given month will not exceed the total amount paid by Buyer to Seller for Products supplied to Seller during that month for use on containers or flatracks covered under this Warranty.

2. **Exclusions.** Seller does not warrant (a) any products not sold by Seller, (b) defects caused by failure to provide suitable storage or application environment for the Products, (c) damage caused by use of the Products for purposes other than those for which they were intended, (d) damage caused by disaster such as fire, flood, wind or lightning, (e) damage during shipment, (f) damage caused by unauthorized modification of the Products, (g) damage caused by animal waste, harmful chemicals, or other substances, (h) any other abuse or misuse by Buyer or end user, (i) defects due to failure to follow Seller's written preparation, pretreatment and application procedures (j) damage due to normal wear and tear (k) any mechanical detachment of the coating caused by collision, falling, scratches, etc. (l) mishandling or improper operation of equipment (m) damage caused by structural defects of the container or flatrack itself (n) defects on fittings or accessories applied prior to the coating itself (o) changes to the coating that do not impact anti corrosive properties such as color change, gloss change, etc. (p) claims after the warranty expiry date.

3. **Disclaimer. THE LIMITED WARRANTY SET FORTH ABOVE IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, AND SELLER DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

4. **Limitation of Remedies.** In no case will Seller be liable for any special, incidental or consequential damages based upon breach of warranty or any other legal theory. Such excluded damages include, but are not limited to, loss of profits, loss of savings or revenue, loss of use of the Products, cost of capital, cost of any substitute products, down time, claims of third parties, including customers and injury to property.

5. **No Other Warranties.** Unless modified in a writing signed by the officers of both parties, this limited warranty is understood to be the complete and exclusive agreement between the parties with respect to warranties, superseding all prior agreements, discussions and representations, oral or written, all other communications between the parties relating to Seller's warranties of, and liability with respect to, the Products. No employee of Seller is authorized to make any warranty in addition to those made in this Agreement. Seller is not liable for any warranty Buyer may make to any of Buyer's customers.

6. **Allocation of Risks.** This limited warranty allocates the risk of failure of the Products between Seller and Buyer. This allocation is recognized by both parties and is reflected in the price of the Products. Buyer acknowledges this limited warranty and is bound by its terms. Seller and Buyer agree that they will use their best efforts to resolve any disputes arising under this Warranty informally. Seller and Buyer consent to the exclusive jurisdiction of the state and federal courts of the State of Minnesota, USA, in the event litigation is necessary.

The undersigned agrees that the terms and conditions contained in this limited warranty apply to and govern all orders of Products by the undersigned from Seller, notwithstanding anything to the contrary contained in any purchase order or other document of the undersigned.

Container Manufacturer Name

By Terry A. Brennan

Date 8-6-10 Title V.P. Operations

**APPROVED VALSPAR COATING SYSTEMS:**

Standard operating procedures and preparation, pretreatment and application requirements will be established for each entity to whom Products are sold and this warranty is offered. The agreed standard operating procedures and preparation, pretreatment and application requirements will become part of and be incorporated by reference into this warranty.